1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  THOMAS J. O'REARDON II (247952)
   JAMES M. DAVIS (301636)
3  501 West Broadway, Suite 1490
   San Diego, CA  92101
4  Tel: 619/338-1100
   619/338-1101 (fax)
5  tblood@bholaw.com
   toreardon@bholaw.com
6  jdavis@bholaw.com

7  MATTHIESEN, WICKERT & LEHRER, S.C.
   RICHARD A. SCHUSTER
8  ASHTON T. KIRSCH
   1111 E. Sumner Street
9  Hartford, WI  270670
   Tel: 262/673-7850
10 262/673-3766 (fax)
   rschuster@mwl-law.com
11 akirsch@mwl-law.com

12 [Additional Counsel Appear on Signature Page]

13 Attorneys for Plaintiffs

14            **UNITED STATES DISTRICT COURT**

15            **CENTRAL DISTRICT OF CALIFORNIA**

16 ZURICH AMERICAN INSURANCE          Case No.   8:23-cv-01051
   COMPANY; AMERICAN
17 GUARANTEE AND LIABILITY
   INSURANCE COMPANY;               **COMPLAINT FOR DAMAGES,**
18 AMERICAN ZURICH INSURANCE        **INJUNCTIVE RELIEF AND**
   COMPANY; EMPIRE FIRE AND         **RESTITUTION**
19 MARINE INSURANCE COMPANY;
   EMPIRE INDEMNITY INSURANCE
20 COMPANY; UNIVERSAL
   UNDERWRITERS INSURANCE
21 COMPANY; UNIVERSAL
   UNDERWRITERS OF TEXAS
22 INSURANCE COMPANY; ZURICH
   AMERICAN INSURANCE
23 COMPANY OF ILLINOIS; COUNTRY
   PREFERRED INSURANCE
24 COMPANY; COUNTRY CASUALTY
   INSURANCE COMPANY; COUNTRY    **DEMAND FOR JURY TRIAL**
25 MUTUAL INSURANCE COMPANY;
   MADISON MUTUAL INSURANCE
26 COMPANY; FEDERATED MUTUAL
   INSURANCE COMPANY;
27 FEDERATED SERVICE INSURANCE
   COMPANY; FEDERATED RESERVE
28 INSURANCE COMPANY: ARIZONA

BLOOD HURST & O' REARDON, LLP

00203355

BLOOD HURST & O' REARDON, LLP

1  AUTOMOBILE INSURANCE
COMPANY; CENTURY SURETY
2  COMPANY; CELINA MUTUAL
INSURANCE COMPANY; MIAMI
3  MUTUAL INSURANCE COMPANY;
NATIONAL MUTUAL INSURANCE
4  COMPANY; FRANKENMUTH
INSURANCE COMPANY;
5  GOODVILLE MUTUAL CASUALTY
COMPANY; MMG INSURANCE
6  COMPANY; KEY INSURANCE
COMPANY; FARM BUREAU
7  GENERAL INSURANCE COMPANY
OF MICHIGAN; 360 INSURANCE
8  COMPANY; MOUNTAIN WEST
FARM BUREAU MUTUAL
9  INSURANCE COMPANY; BATTLE
CREEK MUTUAL INSURANCE
10  COMPANY; NODAK INSURANCE
COMPANY; GOAUTO INSURANCE
11  COMPANY; AMERICAN WEST
INSURANCE COMPANY; PIONEER
12  STATE MUTUAL INSURANCE
COMPANY; WAYNE MUTUAL
13  INSURANCE COMPANY; NEVADA
GENERAL INSURANCE COMPANY;
14  WOLVERINE MUTUAL
INSURANCE COMPANY;
15  LEMONADE INSURANCE
COMPANY; METROMILE
16  INSURANCE COMPANY; AUTO-
OWNERS INSURANCE COMPANY;
17  HOME-OWNERS INSURANCE
COMPANY; OWNERS INSURANCE
18  COMPANY; SOUTHERN-OWNERS
INSURANCE COMPANY;
19  PROPERTY-OWNERS INSURANCE
COMPANY; FARM BUREAU
20  PROPERTY & CASUALTY
INSURANCE COMPANY; WESTERN
21  AGRICULTURAL INSURANCE
COMPANY; SECURA INSURANCE
22  COMPANY (f/k/a SECURA
INSURANCE, A MUTUAL
23  COMPANY); SECURA SUPREME
INSURANCE COMPANY; ILLINOIS
24  CASUALTY COMPANY;
PHARMACISTS MUTUAL
25  INSURANCE COMPANY; WEST
BEND INSURANCE COMPANY;
26  SHELTER MUTUAL INSURANCE
COMPANY; SHELTER GENERAL
27  INSURANCE COMPANY,

28  Plaintiffs.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

1

2          v.

3     KIA AMERICA, INC.; and HYUNDAI
      MOTOR AMERICA,
4
                Defendants.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

00203355

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Plaintiffs, upon personal knowledge of the facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this complaint against Defendants Kia America, Inc. ("Kia") and Hyundai Motor America ("Hyundai") (Kia and Hyundai are collectively, "Defendants") and allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs provided automobile and property insurance to owners and lessees of certain model year Kia and Hyundai vehicles equipped with traditional "insert-and-turn" steel key ignition systems (the "Subject Vehicles").[1] Defendants manufactured, marketed and sold the Subject Vehicles to Plaintiffs' insureds, and they are responsible for the theft and subsequent loss of use of these vehicles due to their intentional and willful failure to include engine "immobilizers" in the Subject Vehicles. Defendants prioritized their own profit over their customers' safety and security by refusing to include the effective, inexpensive and widely used immobilizer technology in these vehicles, despite knowing the risks and the consequences of their actions.

2.     This subrogation action arises out of property damage and losses resulting from a material, security vulnerability that is shared among the Subject Vehicles: the vehicles are not equipped with an engine immobilizer preventing them from being started unless a code is transmitted from the vehicle's specific smart key.

---

[1]     The Subject Vehicles are 2011-2022 Kia vehicles and 2011-2022 Hyundai vehicles which do not contain an engine immobilizer. As the vehicles' manufacturers, Defendants have knowledge of the specific vehicle models at issue. Upon information and belief, and subject to confirmation through discovery, these models reportedly include Hyundai Accent (2018-2022), Elantra (2011-2022), Elantra GT (2018-2020), Sonata (2011-2019), Veloster (2012-2017, 2019-2021), Venue (2020-2021), Kona (2018-2022), Tucson (2011-2022), Santa Fe (2013-2022), Santa Fe Sport (2013-2018), Santa Fe XL (2019), Palisade (2020-2021) and Gensis Coupe (2013-2014) vehicles.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

Without an engine immobilizer, thieves can easily hotwire or bypass the ignition system and quickly steal the car.

3.      In the case of the Subject Vehicles, the lack of an engine immobilizer makes them vulnerable to theft and has allowed thieves to steal them in as little as 20 to 30 seconds without needing a key. This has been widely documented in news reports from around the country, which have described how thieves are specifically targeting Kia and Hyundai vehicles because they do not contain engine immobilizers and stealing them in large numbers. The inclusion of an engine immobilizer in these vehicles would have prevented this type of theft, protected the safety and security of the owners and lessees, and prevented the damages suffered by Plaintiffs and their insureds.

4.      Between 2011 and 2021, most car manufacturers, including rivals of Hyundai and Kia, embraced engine immobilizer technology as a standard safety feature in their vehicles. This inexpensive technology effectively prevented car theft by ensuring that ignition systems could not be activated without the proper key. However, despite this industry-wide adoption, Hyundai and Kia did not install engine immobilizers in most of their vehicles sold in the United States, thereby failing to keep pace with technological advancements and industry safety standards.

5.      Defendants' failure to keep up with what became a standard anti-theft measure in the car industry is staggering. By 2015, only 26% of Hyundai and Kia vehicle models had engine immobilizers as standard equipment, compared with 96% of other manufacturers' vehicles from that same model year. Defendants' decision to lag the industry was a conscious and knowing one. Because while a staggeringly low percentage of Defendants' vehicles sold in the United States contained engine immobilizers, 100% of their same vehicle models sold in Canada and Europe contained engine immobilizers.

6.      Defendants have admitted that engine immobilizers effectively reduce and deter motor vehicle theft. It made these admissions over 15 years ago, and still

BLOOD HURST & O' REARDON, LLP

00203355

chose to include engine immobilizers in only a small fraction of its vehicles. Hyundai, for instance, even petitioned the National Highway Traffic Safety Administration (NHTSA) in 2007, 2008, and 2010 to exempt its Kia Azera, Gensis, and Amanti vehicle lines from a safety requirement (parts marking) because they would equip engine immobilizers as standard equipment. In support of the petition, Hyundai cited data that showed a significant reduction in theft rates after the introduction of immobilizer devices in several vehicle lines, including Ford Taurus and Mustang, Oldsmobile Riviera and Toronado vehicles, which experienced theft rate reductions of 63%, 70%, 80%, and 58%, respectively. NHTSA reported that Hyundai-Kia Motors Corporation claimed "the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Kia [Azera, Gensis, and Amanti] immobilizer device."[2]

7.      There is more. The Subject Vehicles all suffer from a series of material, security design flaws that allow thieves to steal a Subject Vehicle in less than ninety seconds. The series of design flaws, which are collectively referred to as the "Defect," include: (i) the steering columns do not have adequately secure collars or casings, making it easy to access the ignition assembly to "hot-wire" the vehicle; (ii) the ignition lock cylinders lack a locking feature, which allows them to be easily removed with minimal force while keeping the ignition switch untouched; (iii) the exposed ignition switch can be activated with something as simple as a pair of pliers or even a USB connector, which has become the tool of choice for car thieves; and (iv) the vehicles are not equipped with engine immobilizers.

---

[2]      *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundia-Kia America Technical Center, Inc., 75 Fed. Reg. 1447 (January 11, 2010); Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 73 Fed. Reg. 4304 (January 24, 2008); Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39661 (July 19, 2007).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

8.      The ubiquity and impact of the Defect in the Subject Vehicles is well known to Defendants and thieves alike. Beginning in 2017 at the latest, news coverage about the Defect started appearing. In 2019, the issue gained more widespread attention when a number of law enforcement agencies across the United States reported a surge in thefts of the Subject Vehicles. The issue has continued to receive media coverage since then, with online videos going viral on social media platforms such as TikTok bringing attention to the issue of how certain Kia and Hyundai vehicles are particularly susceptible to theft. Beginning in 2020, videos posted on TikTok illustrate how thieves can easily bypass the ignition system and steal these vehicles in less than a minute. These videos, which have been viewed tens of millions of times, demonstrate that the vulnerability of these vehicles is widely known and can be easily exploited.

9.      Despite their knowledge of the safety and theft risks associated with this Defect, Defendants failed to disclose the existence of the Defect to the owners or lessees of the Subject Vehicles, to Plaintiffs or to the public. Nor have Defendants paid to fix the Defect in the Subject Vehicles, retrofit the Subject Vehicles, offered to reimburse Subject Vehicle owners and lessees for costs and expenses incurred as a result of the Defect, or issued a recall. Rather, Defendants have refused to take any meaningful action to correct this concealed design defect and have otherwise publicly downplayed any safety or theft risks, including by issuing public statements that owners and lessees should be assured that the Subject Vehicles comply with safety and security standards.

10.    As a result of the Defect, Plaintiffs' insureds purchased and leased Subject Vehicles that are of a lesser standard, grade, value, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe vehicles with adequate anti-theft protection.

11.    As a result of Defendants' failure to include engine immobilizers, the Subject Vehicles at issue insured by Plaintiffs were stolen and never returned or, when

they were found, were damaged. Other times, the vehicles were stolen and then involved in collisions causing damage to the Subject Vehicle itself and to other persons or property.

12.     As part of their insurance policies with the insureds—owners and lessees of the Subject Vehicles—Plaintiffs have agreed to cover losses suffered by their insureds due to theft or damage to Subject Vehicles. Plaintiffs have paid for covered losses suffered by their insureds arising from the Defect, consequently are entitled to "stand in the shoes" of their insureds as to all legal claims, and so now bring this subrogation action against Defendants. Defendants' failure to include an engine immobilizer in the Subject Vehicles directly caused the theft and subsequent loss of the insured vehicles. As a result, Defendants' conduct violates state consumer protection laws and constitutes a breach of the implied warranties of merchantability, as well as fraudulent omissions and concealment, and unjust enrichment. Plaintiffs have suffered injury in fact and incurred damages. The Subject Vehicles insured by Plaintiffs have been, and still are, being targeted due to the Defect that allows the vehicles to be easily hot-wired and stolen. Because of the ongoing nature of Defendants' misconduct, Plaintiffs will continue to suffer harm and thus also seek declaratory and injunctive relief.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 and is between citizens of different states.

14.     Venue is proper in this judicial District under 28 U.S.C. § 1391(b), because a substantial part of the challenged conduct or omissions giving rise to claims occurred and/or emanated from this District, Defendants are incorporated in this State, and their headquarters are located in this District.

BLOOD HURST & O' REARDON, LLP

00203355

## PARTIES

**A.    Plaintiffs**

15.    Plaintiff Zurich American Insurance Company is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Schaumburg, Illinois. Zurich American Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

16.    Plaintiff American Guarantee and Liability Insurance Company is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Schaumburg, Illinois. American Guarantee and Liability Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

17.    Plaintiff American Zurich Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place

6

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

of business in Schaumburg, Illinois. American Zurich Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

18.   Plaintiff Empire Fire and Marine Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business Schaumburg, Illinois. Empire Fire and Marine Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

19.   Plaintiff Empire Indemnity Insurance Company is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business in Schaumburg, Illinois. Empire Indemnity Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover

BLOOD HURST & O' REARDON, LLP

00203355

the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

20.    Plaintiff Universal Underwriters Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Schaumburg, Illinois. Universal Underwriters Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

21.    Plaintiff Universal Underwriters of Texas Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Schaumburg, Illinois. Universal Underwriters of Texas Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out

BLOOD HURST & O' REARDON, LLP

8

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

22. Plaintiff Zurich American Insurance Company of Illinois is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Schaumburg, Illinois. Zurich American Insurance Company of Illinois is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

23. Plaintiff Country Preferred Insurance Company is organized and existing under the laws of the State of Illinois as a stock insurance company, with its principal place of business in Illinois. Country Preferred Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

24. Plaintiff Country Casualty Insurance Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

1 of business in Illinois. Country Casualty Insurance Company is an insurance carrier.
2 At all relevant times, Plaintiff was authorized to and did regularly write automobile
3 insurance, including providing insurance coverage on Subject Vehicles. Plaintiff
4 provided insurance coverage to one or more of its insureds to cover the property loss
5 and damage of the type sustained in this case arising out of the theft of one or more
6 of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid
7 one or more of its insureds, or paid on behalf of one or more of its insureds, for loss,
8 repair and other damage arising out of the theft of one or more of the Subject Vehicles
9 at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than
10 what it has paid to these insureds.

11      25.     Plaintiff Country Mutual Insurance Company is a mutual insurance
12 company organized and existing under the laws of the State of Illinois, with its
13 principal place of business in Illinois. Country Mutual Insurance Company is an
14 insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly
15 write automobile insurance, including providing insurance coverage on Subject
16 Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover
17 the property loss and damage of the type sustained in this case arising out of the theft
18 of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy,
19 Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its
20 insureds, for loss, repair and other damage arising out of the theft of one or more of
21 the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in
22 amounts no less than what it has paid to these insureds.

23      26.     Plaintiff Madison Mutual Insurance Company is a corporation organized
24 and existing under the laws of the State of Illinois, with its principal place of business
25 in Illinois. Madison Mutual Insurance Company is an insurance carrier. At all relevant
26 times, Plaintiff was authorized to and did regularly write automobile insurance,
27 including providing insurance coverage on Subject Vehicles. Plaintiff provided
28 insurance coverage to one or more of its insureds to cover the property loss and

damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

27. Plaintiff Federated Mutual Insurance Company is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business in Minnesota. Federated Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

28. Plaintiff Federated Service Insurance Company is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business in Minnesota. Federated Service Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject

00203355

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

29.    Plaintiff Federated Reserve Insurance Company is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business in Minnesota. Federated Reserve Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

30.    Plaintiff Arizona Automobile Insurance Company is a corporation organized and existing under the laws of the State of Arizona, with its principal place of business in Arizona. Arizona Automobile Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

31.    Plaintiff Century Surety Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Ohio. Century Surety Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

32.     Plaintiff Celina Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. Celina Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

33.     Plaintiff Miami Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. Miami Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the

BLOOD HURST & O' REARDON, LLP

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

00203355

Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

34.   Plaintiff National Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. National Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

35.   Plaintiff Frankenmuth Insurance Company is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Michigan. Frankenmuth Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles

14

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

36.     Plaintiff Goodville Mutual Casualty Company is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Pennsylvania. Goodville Mutual Casualty Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

37.     Plaintiff MMG Insurance Company is a corporation organized and existing under the laws of the State of Maine, with its principal place of business in Maine. MMG Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

38.     Plaintiff Key Insurance Company is a corporation organized and existing under the laws of the State of Kansas, with its principal place of business in Kansas.

BLOOD HURST & O' REARDON, LLP

Key Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

39. Plaintiff Farm Bureau General Insurance Company of Michigan is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Michigan. Farm Bureau General Insurance Company of Michigan is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

40. Plaintiff 360 Insurance Company is a corporation organized and existing under the laws of the State of Wyoming, with its principal place of business in Wyoming. 360 Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

41.     Plaintiff Mountain West Farm Bureau Mutual Insurance Company is a corporation organized and existing under the laws of the State of Wyoming, with its principal place of business in Wyoming. Mountain West Farm Bureau Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

42.     Plaintiff Battle Creek Mutual Insurance Company is a corporation organized and existing under the laws of the State of Nebraska, with its principal place of business in Nebraska. Battle Creek Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject

Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

43.    Plaintiff Nodak Insurance Company is a corporation organized and existing under the laws of the State of North Dakota, with its principal place of business in North Dakota. Nodak Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

44.    Plaintiff GoAuto Insurance Company is a corporation organized and existing under the laws of the State of North Dakota, with its principal place of business in Louisiana. GoAuto Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

45.    Plaintiff American West Insurance Company is a corporation organized and existing under the laws of the State of North Dakota, with its principal place of

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

business in North Dakota. American West Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

46.    Plaintiff Pioneer State Mutual Insurance Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Michigan. Pioneer State Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

47.    Plaintiff Wayne Mutual Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio. Wayne Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

48.     Plaintiff Nevada General Insurance Company is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Nevada. Nevada General Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

49.     Plaintiff Wolverine Mutual Insurance Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Michigan. Wolverine Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject

BLOOD HURST & O' REARDON, LLP

Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

50.     Plaintiff Lemonade Insurance Company is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York. Lemonade Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

51.     Plaintiff Metromile Insurance Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Arizona. Metromile Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

52.     Plaintiff Auto-Owners Insurance Company is a mutual insurance company organized and existing under the laws of the State of Michigan, with its

BLOOD HURST & O' REARDON, LLP

00203355

principal place of business in Michigan. Auto-Owners Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

53.     Plaintiff Home-Owners Insurance Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Michigan. Home-Owners Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

54.     Plaintiff Owners Insurance Company is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Michigan. Owners Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the

BLOOD HURST & O' REARDON, LLP

00203355

type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

55.     Plaintiff Southern-Owners Insurance Company is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Michigan. Southern-Owners Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

56.     Plaintiff Property-Owners Insurance Company is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Michigan. Property-Owners Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

57. Plaintiff Farm Bureau Property & Casualty Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Polk County, Iowa. Farm Bureau Property & Casualty Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

58. Plaintiff Western Agricultural Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Polk County, Iowa. Western Agricultural Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

59. Plaintiff SECURA Insurance Company (f/k/a SECURA Insurance, A Mutual Company) is a corporation organized and existing under the laws of the State

BLOOD HURST & O' REARDON, LLP

00203355

of Wisconsin, with its principal place of business in Neenah, Wisconsin. SECURA Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

60.    Plaintiff SECURA Supreme Insurance Company is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Neenah, Wisconsin. SECURA Supreme Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

61.    Plaintiff Illinois Casualty Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Rock Island, Illinois. Illinois Casualty Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

62.    Plaintiff Pharmacists Mutual Insurance Company is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business in Iowa. Pharmacists Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

63.    Plaintiff West Bend Mutual Insurance Company is a mutual insurance company organized and existing under the laws of the State of Wisconsin, with its principal place of business in Wisconsin. West Bend Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

64.    Plaintiff Shelter Mutual Insurance Company is a mutual company organized and existing under the laws of the State of Missouri, with its principal place of business in Missouri. Shelter Mutual Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds.

65.    Plaintiff Shelter General Insurance Company is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Missouri. Shelter General Insurance Company is an insurance carrier. At all relevant times, Plaintiff was authorized to and did regularly write automobile insurance, including providing insurance coverage on Subject Vehicles. Plaintiff provided insurance coverage to one or more of its insureds to cover the property loss and damage of the type sustained in this case arising out of the theft of one or more of the Subject Vehicles at issue. Pursuant to its insurance policy, Plaintiff has paid one or more of its insureds, or paid on behalf of one or more of its insureds, for loss, repair and other damage arising out of the theft of one or more of the Subject Vehicles at issue. Plaintiff is subrogated to the rights of these insureds in amounts no less than what it has paid to these insureds

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

**B.      Defendants**

66.     Defendant Kia America, Inc. is a California corporation with its principal place of business in Irvine, California. Kia America, Inc. is actively engaged in manufacturing, assembling, marketing, and distributing Kia vehicles sold in the United States.

67.     Kia America, Inc.'s C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Kia vehicles are located at the company's Irvine headquarters. The decisions regarding the marketing and sale of the Subject Vehicles, the development and issuance of safety recalls, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by Kia America, Inc. at its California headquarters.

68.     Defendant Hyundai Motor America is a California corporation with its principal place of business in Fountain Valley, California. Hyundai Motor America also maintains a 4,300-acre testing facility in Irwindale, California. Hyundai Motor America is a subsidiary of Hyundai Motor Corporation and is actively engaged in manufacturing, assembling, marketing, and distributing Hyundai vehicles sold in California and the rest of the United States.

69.     Hyundai Motor America's C-Suite, executives, and employees responsible for the manufacture, development, distribution, marketing, sales, customer service, and warranty servicing of Hyundai vehicles are located at the company's Fountain Valley headquarters. The decisions regarding the marketing and sale of the Subject Vehicles, the development and issuance of safety recalls, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by Hyundai Motor America at its California headquarters.

70.     Kia America, Inc. and Hyundai Motor America are part of the larger Hyundai Motor Group, which is based in South Korea. The companies share certain

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

resources, including technology, research and development, and manufacturing facilities.

**FACTUAL BACKGROUND**

**C.    Engine Immobilizer Technology and Effectiveness**

71.    The Subject Vehicles do not contain engine immobilizer technology.

72.    An engine immobilizer is a device that prevents a vehicle's engine from starting unless the correct key is present, thereby preventing theft.

73.    The engine immobilizer performs an essential function to prevent vehicles from being hot-wired and stolen. A vehicle's engine immobilizer system is essentially an anti-theft system located in the engine that prevents a vehicle's engine from starting unless the correct transponder key is present. This system involves three integral parts, including: (1) a special, digitally coded key or smart key fob; (2) the transponder chip, which is located in the key; and (3) the engine control unit.

74.    Below is a diagram of a typical engine immobilizer system:



75.    First seen in Europe, with the introduction of engine immobilizers in Mercedes-Benz vehicles in 1986, car manufacturers began installing engine immobilizers in the United States in the mid-to-late 1990s. The technology was initially introduced as a security feature in luxury vehicles, but soon became more widespread across the industry. By the early 2000s, many car manufacturers had adopted engine immobilizers as a standard safety feature in their vehicles. Today,

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Blood Hurst & O' Reardon, LLP

engine immobilizers are included as standard equipment in the large majority of new vehicles sold in the United States, as they are an effective means of preventing car theft.

76.    By 2000, engine immobilizers were already standard on 62% of vehicles not manufactured by Defendants. By model year 2015, engine immobilizers were standard on 96% of other manufacturers' vehicles, but just 26% of Hyundai and Kia vehicle models.[3]



77.    Engine immobilizers are inexpensive to include in vehicles, costing as little as $50 or less per vehicle.

78.    If a vehicle has an engine immobilizer system, the chances of it getting stolen are greatly reduced.

79.    Defendants' competitors have long recognized the effectiveness of engine immobilizers in reducing vehicle theft.

---

[3]    IIHS-HLDI, "Hyundais, Kias are easy targets amid boom in vehicle thefts," (Sept. 22, 2022), https://www.iihs.org/news/detail/hyundais-kias-are-easy-targets-amid-boom-in-vehicle-thefts.

BLOOD HURST & O' REARDON, LLP

00203355

BLOOD HURST & O' REARDON, LLP

80.    Ford made engine immobilizers first available in 1993 in Europe on over 750,000 vehicles. The system was available on Ford Escort RS and Fiesta Turbo. The theft rate on these models was reduced at a significant rate of 78% for 1994:

> After a huge success in Europe, we're convinced that this technology puts the amateur out of business and makes it so difficult for professionals that we expect they'll simply avoid trying to steal our [engine immobilizing system]-equipped cars, said Frank Macher, Ford Vice President and General Manger, Automotive Component Division (DiPietro, 1995, p.2).[4]

81.    In 2014, representatives from several major automakers, including BMW, Fiat-Chrysler, Ford, General Motors, Jaguar Land Rover, Mercedes-Benz, Mitsubishi, Porsche, Toyota, Volkswagen, and Volvo, provided a statement to NHTSA, stating that "the benefits of immobilizers in preventing vehicle theft can be tremendous," and that they have exhibited "high effectiveness" in reducing theft.[5]

82.    In 2014, the New York Times published an article "Here's Why Stealing Cars Went Out of Fashion." The NYT reported that between 1990 and 2013, reported auto thefts in New York City went from one for every 50 residents to one for every 1,100 residents – a 96% drop in the rate of car theft. According to the NYT the most important factor for the dramatic reduction in cart thefts was the presence of engine immobilizers:

> The most important factor is a technological advance: engine immobilizer systems, adopted by manufacturers in the late 1990s and early 2000s. These make it essentially impossible to start a car without the ignition key, which contains a microchip uniquely programmed by the dealer to match the car.

---

[4]    *See* Erik Sandvik, The Role of Technology in Reducing Auto Theft, Tallahassee: Florida Department of Law Enforcement (1996), https://www.fdle.state.fl.us/FCJEI/Programs/SLP/Documents/Full-Text/Sandvik.aspx.

[5]    *See* Letter from Will Otero, Director Transportation and Safety Policy, Alliance of Automobile Manufacturers, Inc. to NHTSA (Mar. 18, 2014) (available at https://www.regulations.gov/comment/NHTSA-2014-0007-0003).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

00203355

Criminals generally have not been able to circumvent the technology or make counterfeit keys. "It's very difficult; not just your average perpetrator on the street is going to be able to steal those cars," said Capt. Don Boller, who leads the New York Police Department's auto crime division. Instead, criminals have stuck to stealing older cars.[6]

83.     According to the National Insurance Crime Bureau (NICB), the implementation of engine immobilizers has led to a significant reduction in car theft rates in the United States. The NICB reports that between 1998 and 2016, thefts of vehicles equipped with engine immobilizers declined by 77%, while thefts of vehicles without engine immobilizers decreased by only 40%.[7]

84.     Other facts, which Defendants knew or should have known, demonstrate that engine immobilizers are an inexpensive and highly effective means of preventing car theft and reducing associated losses. Numerous articles, studies and reports have been published that examine and demonstrate the effectiveness of engine immobilizers in reducing vehicle theft rates. These reports are replete with data demonstrating the effectiveness of engine immobilizers in preventing car theft and highlighting the importance of including this technology in new vehicles. For example:

a.     According to Matt Moore, Senior Vice President of the Highway Loss Data Institute (HLDI), a non-profit organization that compiles and publishes insurance loss statistics, "Our earlier studies show that vehicle theft losses plunged after immobilizers were introduced," but "[u]nfortunately, Hyundai and Kia have lagged behind other automakers in making them standard equipment."[8]

---

[6]     Josh Barro, "Here's Why Stealing Card Went Out of Fashion," New York Times (Aug. 11, 2014), https://www.nytimes.com/2014/08/12/upshot/heres-why-stealing-cars-went-out-of-fashion.html.

[7]     Jan C. van Ours & Ben Vollaard, "The Engine Immobiliser: A Non-starter for Car Thieves," The Economic Journal, 126:1264-1291 (June 2016).

[8]     IIHS-HLDI, "Hyundais, Kias are easy targets amid boom in vehicle thefts," (Sept.

Blood Hurst & O' Reardon, LLP

BLOOD HURST & O' REARDON, LLP

b.      According to van Ours and Vollaard (2016), engine immobilizers, "a simple and low-cost anti-theft device," "reduced the probability of car theft by an estimated 50 percent on average in the Netherlands during 1995-2008."[9]

c.      Farrell, Tseloni and Tilley (2011): Cars with central locking plus an electronic immobilizer were up to 25 times less likely to be stolen than those without security.[10]

d.      Citing to its studies from 1996, 1998, 2000, 2012, and 2013, the Highway Loss Data Institute reported in December 2021 that it "found significant reductions in theft losses after passive immobilizing antitheft devices were added to vehicles."[11]

e.      The Highway Loss Data Institute's September 1997 Theft Loss Bulletin reported an overall theft loss decrease of approximately 50% for both the Ford Mustang and Taurus models upon installation of an antitheft immobilization device.[12]

f.      A July 2000 Insurance Institute for Highway Safety (IIHS) news release reported that when comparing theft loss data before and after equipping vehicles with passive immobilizer devices, the data showed

---

[22, 2022), https://www.iihs.org/news/detail/hyundais-kias-are-easy-targets-amid-boom-in-vehicle-thefts.

[9]      Jan C. van Ours & Ben Vollaard, "The Engine Immobiliser: A Non-starter for Car Thieves," The Economic Journal, 126:1264–1291 (June 2016).

[10]      Graham Farrell, Andromachi Tseloni, & Nick Tilley, "The effectiveness of vehicle security devices and their role in the crime drop," Criminology & Criminal Justice, 11(1):21–35 (Mar. 1, 2011).

[11]      Highway Loss Data Institute, "Hyundai and Kia theft losses," (December 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

[12]      *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Mazda, 76 Fed. Reg. 41558 (July 14, 2011); Exemption from Vehicle Theft Protection Standard, 81 Fed. Reg. 66833 (November 28, 2016).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

00203355

an average theft reduction of approximately 50% for vehicles with immobilizer devices.[13]

g.      According to the National Insurance Crime Bureau, the implementation of engine immobilizers has led to a reduction in the overall rate of car theft in the United States. In 1991, the car theft rate was 659 thefts per 100,000 population, whereas in 2019, the rate had decreased to 219.9 thefts per 100,000 population.[14]

h.      According to the Government of Western Australia, Department of Transport, immobilizers are "so important" because "[m]otor vehicle theft costs the community millions of dollars each year in medical expenses, police time and energy, insurance costs and repairs to damages vehicles and property." "Immobilisers greatly reduce the chance of having your car stolen."[15]

i.      As reported in a study funded by Australia's National Motor Vehicle Theft Reduction Council, by 2000, vehicles without engine immobilizers were 4.81 times as likely to be stolen as vehicles with immobilizers.[16]

j.      Brown and Thomas (2003) examined the effectiveness of engine immobilizers in the United Kingdom following the implementation of EU legislation in 1998. Using data from the Home Office Car Theft

---

[13]    *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Mazda, 76 Fed. Reg. 41558 (July 14, 2011).

[14]    *See* FBI's Uniform Crime Reporting (UCR) program: https://ucr.fbi.gov/crime-in-the.u.s/2019/crime-in-the.u.s.-2019/topic-pages/motor-vehicle-theft

[15]    Government of Western Australia, Department of Transport, "Immobilisers," https://www.transport.wa.gov.au/licensing/immobilisers.asp (last accessed May 22, 2023).

[16]    Robert Potter & Paul Thomas, "Engine Immobilizers: How Effective Are They?," (Oct. 18, 2001), http://carsafe.com.au/docs/immobiliser_paper.pdf.

BLOOD HURST & O' REARDON, LLP

00203355

Index 2001, the authors found that the introduction of compulsory immobilizers was effective in reducing cart thefts.[17]

85.    Dixon and Farrell (2020) examined the rates of motor vehicle thefts in the United States from 1960 onward. The researchers concluded that improved vehicle security in the 1990s had a huge effect on reducing thefts committed by young people. This decrease was so significant that it resulted in lower rates of vehicle theft among those age groups even as they grew older. The researchers identified one security feature in particular that led to this decrease in theft activity: emergence of engine immobilizers:

> From the early 1990s onwards, it gradually became less easy for adolescents to begin offending as an increasing proportion of vehicles became secure (as secure new vehicles were purchased, and insecure old ones scrapped). Potential young offenders did not have the skill or experience to overcome the new vehicle security technology, ***particularly electronic immobilizers***. The result was a reduced rate of offending, not just as a short-term period effect when they were adolescents, but among cohorts which experienced lower rates of offending as they aged through the life-course. The rate of offending among subsequent cohorts decreased further over time as improved vehicle security became more prevalent and continued to improve, fewer adolescents experiencing criminal career onset and continuance.[18]

86.    A 2016 government research report from the United Kingdom's Home Office concluded, "electronic immobilisers clearly drove a reduction in vehicle thefts." The conclusion was supported by the fact that other "[r]esearch has demonstrated that cars with electronic immobilisers are far less likely to be stolen than cars without immobilisers (van Ours and Vollaard, 2014; Farrell, Tseloni, and Tilley, 2011; Brown, 2013)" and the data shows that "once electronic immobilisers were

[17]    Rick Brown & Nerys Thomas, "Aging Vehicles: Evidence of the Effectiveness of New cart Security from the Home Office Car Theft Index," Security Journal, 16(3):45–53 (2003).

[18]    Anthony Dixon & Graham Farrell, "Age-period-cohort effects in half a century of motor vehicle theft in the United States," Crime Science, 9:17 (Oct. 1, 2020).

BLOOD HURST & O' REARDON, LLP

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

00203355

installed on around half the vehicle fleet all these nations [England, Wales, Scotland, Netherlands, Sweden, Australia, United States, and Canada] saw a sharp decline in vehicle thefts of around 40 per cent."[19]

**Table 1: Findings from cross-national analysis on electronic immobilisers**

|  | Eng + Wales | Scotland | Netherlands | Sweden | Australia | US | Canada |
|---|---|---|---|---|---|---|---|
| **Dates of electronic immobiliser spread** | | | | | | | |
| Estimated first appearance of electronic immobilisers in mass market vehicles | 1991-92 | 1991-92 | 1991-92 | 1991-92 | 1989-1990 | 1988-1992 | 1988-1992 |
| Year in which electronic immobilisers mandated on new vehicles | 1998 | 1998 | 1998 | 1998 | 2001 | None | 2007 |
| Estimated year in which 50% of all vehicles have electronic immobilisers (threshold) | 2000 | 2000 | 2000 | 2000 | 2000 | 2006 | 2006 |
| **Changes in numbers of police-recorded vehicle thefts** | | | | | | | |
| Five years pre-threshold | -33% | -31% | -5% | 9% | 9% | -2% | -6% |
| Five years post-threshold | -41% | -35% | -44% | -39% | -46% | -34% | -46% |

87. The majority of major automakers have made public statements confirming that engine immobilizers effectively reduce vehicle thefts. These statements, along with data demonstrating the effectiveness of immobilizers, were readily available in the industry. Many of these statements were made over a decade ago. As industry participants, Defendants were aware, or should have been aware, of this information. These statements and reports by Defendants' competitors include the following:

> a. Volkswagen reported to NHTSA that data from the Highway Loss Data Institute showed that BMW vehicles experienced theft loss reductions resulting in a 73% decrease in relative claim frequency and a 78% lower average loss payment per claim for vehicles equipped with an engine immobilizer.[20]

---

[19] Nick Morgan, Oliver Shaw, Andy Feist & Christos Byron, "Reducing criminal opportunity: vehicle security and vehicle crime," United Kingdom Home Office, Research Report 87 (Jan. 2016).

[20] *See* Petition for Exemption From the Federal Motor Vehicle Theft Prevention

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

b.      In 2012, the makers of Subaru vehicles reported to NHTSA that "it presently has immobilizer devices on all of its product lines (Forester, Tribeca, Impreza, Legacy and Outback models) and it believes the data show immobilization has had a demonstrable effect in lowering its theft rates."[21] For example, while the median theft rate (per 1000 vehicles) averaged 3.5286, the theft rate data for the Subaru Tribeca, Forester, Impreza, Legacy and Outback vehicle lines using an average of 3 model years' data (2007-2009) was 0.4396, 0.5677, 0.9135, 0.7681 and 0.4394 respectively.

c.      Ford Motor Company claimed that its model year 1997 Mustang vehicle line (with an immobilizer) led to a 70% reduction in theft compared to its model year 1995 Mustang (without an immobilizer).[22]

d.      Chrysler Corporation informed NHTSA that the installation of a standard immobilizer device in Jeep Grand Cherokee vehicles reduced the average theft rate by approximately 53.2% based on a comparison of thefts between model year 1995-98 vehicles (without engine immobilizers) and model year 1999-2008 vehicles (with engine immobilizers).[23]

e.      Mitsubishi Motors Corporation informed NHTSA that the theft rate for its model year 2000 Eclipse vehicle line (with an immobilizer

---

Standard; Volkswagen Group of America, Inc., 87 Fed. Reg. 14946 (Mar. 16, 2022).
[21]      *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Fuji Heavy Industries U.S.A., Inc., 77 Fed. Reg. 1974 (Jan. 12, 2012).
[22]      *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Fuji Heavy Industries U.S.A., Inc., 77 Fed. Reg. 1974 (Jan. 12, 2012); *see also* Jim McGraw, "Playing Hard to Get for Car Thieves," N.Y. Times (Nov. 26, 1999) ("thefts of some Ford vehicles had dropped 75 percent since [an engine immobilizer] was first used in 1996 models of the Mustang and Taurus").
[23]      *See* Petition for Exemption From the Federal Motor Vehicle Theft Prevention Standard; Chrysler, 76 Fed. Reg. 68262 (Nov. 3, 2011).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

device) was almost 42% lower than that of its model year 1999 Eclipse (without a immobilizer device).[24]

f.      Mazda Motor Corporation reported that a comparison of theft loss data showed an average theft reduction of approximately 50% after an immobilizer device was installed as standard equipment in a vehicle line.[25]

g.      According to Toyota's report to NHTSA, the average theft rate for the Corolla reduced from 4.0 per 1,000 vehicles (1996-1999) to 2.1 per 1,000 vehicles (2005-2008) after the installation of a standard immobilizer. This represents an approximate 47.5% decrease in the theft rate.[26]

h.      With regard to Nissan Altima vehicles, Toyota reported that data before and after being equipped with a standard immobilizer showed the average theft rate drop to 3.0 per 1,000 vehicles (2000-2006) compared to 5.3 per 1,000 vehicles (1996-1999), representing an approximate 43% decrease in theft rate with an immobilizer.[27]

i.      Subaru reported to NHTSA that the theft rate of the model year 2008 Impreza (not parts marked, standard engine immobilizer) decreased by almost 51% as compared to the model year 2007 Impreza (parts marked with optional engine immobilizer).[28]

---

[24]     *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Mitsubishi Motors, 77 Fed. Reg. 20486 (Apr. 4, 2012).
[25]     *See* Petition for Exemption From the Vehicle Theft Prevention Standard; Mazda, 76 Fed. Reg. 41558 (July 14, 2011).
[26]     *See* Petition for Exemption From the Federal Motor Vehicle Theft Prevention Standard; Toyota Motor North America, Inc., 80 Fed. Reg. 15118 (Mar. 10, 2023).
[27]     *See* Petition for Exemption From the Federal Motor Vehicle Theft Prevention Standard; Toyota Motor North America, Inc., 87 Fed. Reg. 13355 (Mar. 9, 2022).
[28]     *See* Petition for Exemption From the Federal Motor Vehicle Theft Prevention Standard; North American Subaru, Inc., 87 Fed. Reg. 13358 (Mar. 9, 2022).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O'REARDON, LLP

00203355

**D.    The Defect in Defendants' Subject Vehicles Has Led to Thousands of Thefts and Break-Ins**

88.    The Defect in the Subject Vehicles inherently makes them increasingly susceptible to theft—a phenomenon that has led to thousands of Subject Vehicles being stolen and broken into across the United States.

89.    Due to the Defect in the Subject Vehicles, a new TikTok challenge has led to a significant increase in car thefts across the country. The TikTok challenge is dubbed "Kia Boyz," which instructs and encourages viewers to break inside the Subject Vehicles and instructs viewers how to hot-wire the vehicles by using a phone charger or USB cable. Within minutes, a car thief can break into a Subject Vehicle, hot-wire it, and steal the vehicle from its rightful owner.

90.    These videos publicized and made clear that in addition to the lack of an engine immobilizer, a series of other design flaws in the Subject Vehicles allow thieves to steal the Subject Vehicles in a matter of seconds.

91.    First, thieves have realized that most Hyundai and Kia cars on the road lack an engine immobilizer. It is simple for them to spot the Subject Vehicles because Hyundai and Kia cars sold with a traditional key ignition system, as opposed to a "push-to-start" system, lack immobilizers. Thieves can identify these cars just by looking through the window, as push-to-start cars have a start button located at the base of the dashboard while traditional key ignition cars have an ignition cylinder on the steering column.

92.    Second, the Subject Vehicles lack alarms or sensors on the windows, letting thieves break into the cars without causing a scene. The alarm system in these cars is deficiently designed because it doesn't go off when the windows are smashed – a common method thieves use to gain entry.

93.    Third, the steering columns in the Subject Vehicles do not contain adequate casing or a hardened collar, making them easy to pull off.

BLOOD HURST & O' REARDON, LLP

00203355

94.    Fourth, the ignition lock assembly, which includes the lock cylinder, can be quickly and easily taken apart using a simple tool such as a screwdriver or with minimal force, which exposes the ignition switch.

95.    Fifth, thieves have found that the end of a USB cable, which is now common in most cars, fits perfectly into the ignition switch and can start the Subject Vehicles with a quick twist. Although a USB cable is often used for this purpose, any pair of pliers can do the job just as well. Once the ignition switch is turned and the car is started, the steering lock is disabled.

96.    Numerous instances of thefts involving the vehicles in question have been documented by news reports from law enforcement agencies and other sources across the country:

> a.    Milwaukee, Wisconsin: "In just the first six months of the year, Hyundai thefts are up more than 1,700%. Kia thefts nearly doubled that rise. They are up by almost 3,200%." – kbb.com, December 14, 2021[29]

> b.    St. Petersburg, Florida: Between July 11 and July 28, 2022, 23 of 56 (41%) vehicles stolen in St. Petersburg, Florida were Kia or Hyundai vehicles without engine immobilizers. – Wfla.com, July 28, 2022[30]

> c.    Los Angeles, California: Los Angeles officials say the viral trend has led to an 85% increase in car theft of Hyundais and Kias compared with last year. – LAPD Chief Michael Moore, September 2022[31]

[29]    Sean Tucker, "Milwaukee Police Report Hyundais, Kias Stolen in Record Numbers," Kelley Blue Book (Dec. 14, 2021), https://www.kbb.com/car-news/milwaukee-police-report-hyundais-kias-stolen-in-record-numbers/.

[30]    Mary O'Connell, "St. Pete Police warn about troubling car theft trend targeting Kia, Hyundai cars," ABC Action News WFTS Tampa Bay (July 28, 2022), https://www.abcactionnews.com/news/region-pinellas/st-pete-police-warn-about-troubling-car-theft-trend-targeting-kia-hyundai-cars.

[31]    Chris DiLella & Andrea Day, "TikTok challenge spurs rise in thefts of Kia, Hyundai cars," CNBC (Sept. 8, 2022), https://www.cnbc.com/2022/09/08/tiktok-challenge-spurs-rise-in-thefts-of-kia-hyundai-cars.html.

BLOOD HURST & O' REARDON, LLP

d.      Chicago, Illinois: Thefts "up over 800% in the last month," – Cook County Sheriff, September 2022[32]

e.      Detroit, Michigan: "111 Kias stolen in July [2022] and 22 in the first nine days of August [2022], per its police department. That's up from 23 in June and 11 or fewer in all previous months of 2022." – Axios Detroit, August 27, 2022[33]

f.      Norfolk, Virginia: "the City of Norfolk has seen a 35% increase in the theft of Kia's and Hyundai's from July 1 to July 17 [of 2022]" – wavy.com, July 21, 2022[34]

g.      St. Louis, Missouri: "Police have logged 155 incidents of stolen Kia vehicles and 142 incidents of stolen Hyundai vehicles since the beginning of the year. Compared to this timeframe last year, police reported only 61 and 64 incidents of stolen Kia and Hyundai vehicles respectively." – fox2now.com, June 9, 2022[35]

h.      Portland, Oregon: "From June 12 to Aug. 20, Portland saw a 269% increase in stolen Kias and a 153% increase in stolen Hyundais compared to the previous 10-week period, according to Portland police data. That

---

[32]    *Id.*

[33]    Annalise Frank, "Thieves across America are stealing Hyundais and Kias in seconds," AXIOS (Aug. 27, 2022), https://www.axios.com/2022/08/27/kia-hyundai-thefts-stolen-usb-immobilizer-tiktok.

[34]    Courtney Ingalls, "Norfolk Police Department warns of increased Kia and Hyundai thefts," 10 On Your Side WAVY.com (July 21, 2022), https://www.wavy.com/news/local-news/norfolk/norfolk-police-department-warns-of-increased-kia-and-hyundai-thefts/.

[35]    Joey Schneider, "St. Louis police see spike in stolen Kia, Hyundai vehicles," FOX2 Now (June 9, 2022), https://fox2now.com/news/st-louis-police-see-spike-in-stolen-kia-hyundai-vehicles/. *See also* Christine Byers, "Byers' Beat: How a 1990s car theft problem has come back to haunt the St. Louis area," (Sept. 2, 2022), https://www.ksdk.com/article/news/crime/byers-beat/hyundai-kia-st-louis-car-theft-1990s-chrysler/63-121dc658-0876-43fb-98d5-9be532c14316 (St. Louis, Missouri: 1000% increase in Kia and Hyundai thefts).

41

equates to 144 stolen Kias and 81 stolen Hyundais in the past 10 weeks…. Police said there was a 5% drop in thefts for all other vehicle makes during that timeframe." kgw.com – August 26, 2022[36]

i.    Charlotte, North Caorolina: "police report 156 Kia and Hyundai thefts since June 20, a 346% increase from 35 incidents in the same timeframe last year" – Axios Detroit, August 27, 2022[37]

j.    Wisconsin: "Per the [National Insurance Crime Bureau's (NICB's)] 2021 Hot Wheels report, seven of the top 10 most stolen vehicles in Wisconsin were Kias or Hyundais. But none of those vehicles made the top 10 in the state in the 2020 report." - Axios Detroit, August 27, 2022[38]

k.    Omaha, Nebraska: "Thefts of Kia and Hyundai vehicles reported in the first seven months of 2022 have shown an 80% increase compared to thefts of those vehicles in 2020 and 2021." – wowt.com, July 28, 2022[39]

BLOOD HURST & O' REARDON, LLP

---

[36]    David Mann, "Portland police say a TikTok trend has caused Kia, Hyundai thefts to spike," KGW8 (Aug. 26, 2022), https://www.kgw.com/article/news/crime/tiktok-trend-kia-hyundai-thefts-portland/283-9f06a93a-cc9d-4bd9-9bfb-c7c75884b66d.

[37]    Annalise Frank, "Thieves across America are stealing Hyundais and Kias in seconds," AXIOS (Aug. 27, 2022), https://www.axios.com/2022/08/27/kia-hyundai-thefts-stolen-usb-immobilizer-tiktok.

[38]    *Id.*

[39]    Gina Dvorak, "Omaha Police alert Kia, Hyundai owners about trending thefts," 6 News WOWT (July 28, 2022), https://www.wowt.com/2022/07/28/omaha-police-alert-kia-hyundai-owners-about-trending-thefts/. *See also* Brian Mastre, "Kia, Hyundai thefts skyrocket in Omaha as TikTok challenge goes viral," 6 News WOWT (Aug. 15, 2022), https://www.wowt.com/2022/08/15/kia-hyundai-thefts-continue-skyrocket-omaha-tiktok-challenge-goes-viral/ (600% increase in Kia and Hyundai thefts).

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

1   l. Louisville, Kentucky: "LMPD said from July 1 to July 25, 52

2 vehicles have been stolen, with about half being Kias and half being

3 Hyundais." – wlky.com, July 27, 2022[40]

4   m. Seattle, Washington: "Seattle police said they investigated 36

5 reports of stolen Kias last month — compared with five in July last year

6 — and believe thieves may be using a method learned from tutorial

7 videos on how to use other tools in place of a key." – Seattle Times,

8 August 16, 2022[41]

9   n. St. Paul, Minnesota: Kia thefts were up 1,300%, Hyundai thefts

10 up 584% in 2022. – fox9.com, July 18, 2022[42]

11   97. This is not an exhaustive list of all the areas seeing an increase in car

12 thefts due to Subject Vehicles' Defect. Across the country, thousands of individuals

13 are being targeted due to the absence of immobilizers in Defendants' Subject

14 Vehicles.

15   98. From January to June 2021, theft claims for Hyundai and Kia vehicles

16 were almost 80% higher than that of all other manufacturers combined.[43]

17 ///

18 ///

19 ///

20

---

21 [40] Gladys Baustista, "LMPD: Police see rise in Kia, Hyundai thefts after viral TikTok challenge," Wlky.com (July 27, 2022), https://www.wlky.com/article/lmpd-

22 police-kia-hyundai-thefts-tiktok-challenge-louisville/40734532.

23 [41] Christine Clarridge, "Seattle's rising Kia car thefts linked to TikTok videos, police say," Seattle Times (Aug. 16, 2022), https://www.seattletimes.com/seattle-

24 news/seattles-rising-kia-car-thefts-linked-to-tiktok-videos-police-say/.

25 [42] Rose Schmidt, "St. Paul PD: Kia thefts up 1,300%, Hyundai thefts up 584% in 2022," FOX 9 KMSP (July 18, 2022), https://www.fox9.com/news/st-paul-pd-kia-

26 thefts-up-1300-hyundai-thefts-up-584-in-2022.

27 [43] Highway Loss Data Institute, "Hyundai and Kia theft losses," Loss Bulletin, 38(28) (Dec. 2021), https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-

28 081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.

00203355



99.    Federal Motor Vehicle Safety Standard ("FMVSS") 114 is a regulation issued by the National Highway Traffic Safety Administration (NHTSA) that sets forth requirements for theft protection in motor vehicles. FMVSS 114 requires that all passenger cars, multipurpose passenger vehicles, trucks, and buses with a gross vehicle weight rating of 4,536 kilograms or less, manufactured on or after September 1, 1990, must be equipped with an anti-theft device that meets the requirements of the regulation. The regulation also sets forth specifications for the performance and design of these anti-theft devices, including engine immobilizers.

100.   While representatives from Defendants assert that the Subject Vehicles comply with federal standards, the Defendants' failure to include engine immobilizers in the Subject Vehicles violates FMVSS 114.

101.   The anti-theft technology in the Subject Vehicles does not comply with FMVSS 114, specifically section 5.1.1. This section requires each vehicle be equipped with a starting system which, whenever the key is removed from the starting system prevents:

    a.    The normal activation of the vehicle's engine or motor; and

    b.    Either steering, or forward self-mobility, of the vehicle, or both.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

102.   The Subject Vehicles do not comply with FMVSS 114 because when the key is removed from the starting system, neither steering nor forward self-mobility is prevented. A screwdriver and USB cable are sufficient to start and drive off with the cars in a matter of seconds or minutes—no key required. Such starting systems do not meet FMVSS 114's requirements.

103.   Defendants had previously sought to add engine immobilizer systems to some of its vehicles in 2009, citing the effectiveness of such systems in other vehicles. *See* Federal Register, Vol. 75, No. 6, p. 1448, January 11, 2010. Indeed, Defendants cited to reports regarding vehicles from other manufacturers showing as much as an 80% theft rate reduction with the introduction of engine immobilizers. *Id.*

104.   Engine immobilizers are so universally considered an effective and inexpensive way to provide safety and security that they are included in many of Defendants' other vehicles. These vehicles include the Kia Sorento, the Hyundai Santa Fe, and the Hyundai Elantra. In fact, Kia and Hyundai included immobilizers as a standard feature in their vehicles sold in Canada and Europe with the same make, model, and year as the Subject Vehicles.

105.   Because of the obvious advantages they offer and due to the public pressure and condemnation they now face, Defendants began installing engine immobilizers in all Kia and Hyundai vehicles in 2022. This was too little and too late for owners and lessees of the Subject Vehicles whose vehicles still contain the Defect, which leaves them and Plaintiffs at risk of substantial damages and harm.

**E.   Defendants Have Failed to Address the Defect**

106.   Defendants are fully aware of the increased safety and theft hazards associated with the Subject Vehicles and have acknowledged that the root cause of this issue is the Defect.

107.   Kia spokesperson James Bell was quoted in a story published on October 20, 2022 stating, "While no car can be made completely theft-proof, criminals are

BLOOD HURST & O' REARDON, LLP

00203355

targeting vehicles equipped with a steel key and 'turn-to-start' ignition system as opposed to those equipped with a key fob and 'push-button-to-start' system."[44]

108.   Similarly, a Hyundai spokesperson acknowledged the Defect and the wave in thefts, but deflected the blame onto "social media." "The recent rise in thefts of our vehicles without engine immobilizers has been caused by irresponsible social media 'challenges,'" said Ira Gabriel with Hyundai Motor America. "It is no way indicative that our vehicles are not in compliance with the legal and engineering performance requirements of FMVSS 114."[45]

109.   Defendants concealed or otherwise failed to disclose, reveal, or provide notice to the vehicles' owners and lessees, Plaintiffs or the general public, in Defendants' advertising, labeling or otherwise that the Subject Vehicles were, and still are, defective and are not fit for the ordinary purposes for which the vehicles are used in that they are easy to steal, unsafe, and worth less than they should be, if they were not defective.

110.   Defendants refuse to fix the Defect by installing engine immobilizer technology in the Subject Vehicles. Rather than offer an actual fix, Defendants announced on February 14, 2022, that drivers would be eligible sometime in the future for a "software upgrade" to help address the safety, security and theft consequences from Defendants' Defect. This software update, which is part of a customer service campaign and not an official safety recall overseen by the NHTSA, is being rolled out in the future at some point and does not fix the Defect or otherwise make whole or

---

[44]   Lurah Lowery, "Hyundai & Kia offering anti-theft kits for older model vehicles, facing dozens of lawsuits over absence of immobilizers," Repairer Driven News (Oct. 20, 2022), https://www.repairerdrivennews.com/2022/10/20/hyundai-kia-offering-anti-theft-kits-for-older-model-vehicles-facing-dozens-of-lawsuits-over-absence-of-immobilizers/.

[45]   Lexi Sutter & Tom Jones, "Safety Advocates Say Hyundai, Kia's Anti-Theft Upgrade Doesn't Go Far Enough," NBC Chicago (Feb. 22, 2023), https://www.nbcchicago.com/consumer/safety-advocates-say-hyundai-kias-anti-theft-upgrade-doesnt-go-far-enough/3078577/

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

1   reimburse drivers or Plaintiffs for damages they suffered from prior thefts and other
2   foreseeable consequences of Defendants' Defect. Moreover, Defendants admit that
3   approximately 15% of the Subject Vehicles cannot even receive the software update.

4   **F.    Defendants' Misconduct Injured Plaintiffs**

5   111.   Defendants' decision not to include engine immobilizers in the identified
6   vehicles was a reckless and intentional choice that prioritized their own profits over
7   the safety and security of their customers.

8   112.   Defendants' failure to include an engine immobilizer in the identified
9   vehicles made them more susceptible to theft and ultimately led to the theft and
10  subsequent loss of these vehicles to their insureds.

11  113.   Plaintiffs paid insurance claims to their insureds for the theft and
12  subsequent loss of these vehicles.

13  114.   Plaintiffs' payments were made pursuant to their obligations under the
14  insurance policies issued to their insureds.

15  115.   By virtue of their payments, Plaintiffs are now legally, equitably and
16  contractually subrogated to the claims of their insured owners and lessees of the
17  Subject Vehicles against any responsible third parties, including the Defendants
18  herein. Accordingly, Plaintiffs stand in the shoes of their insureds and authorized to
19  pursue all claims and causes of action belonging to their insureds against Defendants
20  who are liable for having caused the property damage losses paid by the Plaintiffs.

21  116.   As a result of Defendants' misconduct at issue, the insured vehicles were
22  damaged, stolen and lost, and Plaintiffs incurred adjustment and claim expenses
23  which they otherwise would not have incurred. Accordingly, Plaintiffs are also
24  entitled to recover damages incurred in investigating and adjusting the claims at issue.

25  117.   Defendants' intentional and willful failure to include engine
26  immobilizers in the identified vehicles was a direct and proximate cause of Plaintiffs'
27  payments to their insureds.

28

BLOOD HURST & O' REARDON, LLP

00203355

47

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

118.   Defendants knew or should have known that their failure to include an engine immobilizer in the Subject Vehicles would increase the risk of theft and loss to their customers.

119.   Despite the well-known risks associated with the theft of these vehicles, Defendants prioritized their own profits over their customers' safety and security, and intentionally chose not to include engine immobilizers in the identified vehicles.

120.   The absence of an engine immobilizer compromises the security of the vehicle, poses safety risks and other inconveniences as described above, and otherwise impairs the utility and value of the vehicle.

121.   Consequently, if ordinary reasonable consumers had known of the Defect, they naturally would consider it an important and material fact in deciding whether to purchase or lease a Subject Vehicle and/or how much to pay for it.

122.   As long-time automotive manufacturers, which have likely conducted numerous customer surveys and fielded thousands of complaints and warranty claims from consumers, Defendants were aware that ordinary reasonable consumers generally expect defect-free automobiles when they make a substantial investment to purchase or lease.

123.   Defendants could and should have designed the Subject Vehicles to be free of the Defect, particularly when their representatives have included immobilizers in certain older vehicles, and state that they will include immobilizers in all newer car models.

124.   Defendants could and should have informed owners, lessees, and Plaintiffs of the Defect rather than concealing it. Such information could have been provided through advertising and marketing campaigns; on-vehicle labeling, stickers, and placards; owner manuals; brochures; pamphlets; dealership personnel and agents; the internet and social media outreach; and through full and complete disclosure through recalls.

125.   Such information could easily have been made known to Plaintiffs' insured owners and lessees by Defendants before they purchased or leases their Subject Vehicles, such as through their interactions with Defendants' dealership personnel and agents; all the various marketing and advertising Defendants undertake (including through television, internet, social media, sporting events, and other media); by looking at their vehicles, upon which Defendants could have affixed a warning about the Defect which owners and lessees would have necessarily seen by looking and sitting in the vehicle itself; and/or through the mail or email, as Defendants could have sent out—and indeed, regularly do send out—for the many recalls Defendants routinely issue each year.

126.   Despite having knowledge of the Defect as detailed above—knowledge far superior to that of ordinary consumers such as the Subject Vehicles' owners and lessees—Defendants remained silent about the Defect for the Subject Vehicles. As a result, the public— including prospective purchasers and lessors like Plaintiffs' insureds—were unaware of the Defect.

127.   Defendants intended to mislead, and in fact misled, ordinary reasonable consumers—including Subject Vehicle owners and lessees—through their omissions and active concealment of the Defect. Defendants did so with the intent to generate and increase sales of the Subject Vehicles, thereby increasing their share of the automobile market and avoiding the expense of installing the engine immobilizer.

128.   For over ten years, Defendants' conduct has placed a target on the insured Subject Vehicles because a thief can easily identify one of the Subject Vehicles, break into the it, and steal it.

129.   If an individual is lucky enough to retrieve their vehicle after it is stolen due to the Defect, costs for repair can cost thousands of dollars on average.[46]

---

[46]   Annalise Frank, "Thieves across America are stealing Hyundais and Kias in seconds," AXIOS (Aug. 27, 2022), https://www.axios.com/2022/08/27/kia-hyundai-thefts-stolen-usb-immobilizer-tiktok.

BLOOD HURST & O' REARDON, LLP

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

130.   Plaintiffs lost money as a result of Defendants' Defect and related unlawful conduct because the Subject Vehicles were stolen and insured property was damaged, while Defendants realized a commensurate unearned gain because did not install engine immobilizers at their own cost and did not deliver to Plaintiffs' insureds what they reasonably expected to receive in exchange for the money they paid.

### TOLLING OF THE STATUTE OF LIMITATIONS

**A.     The Statute of Limitation Did Not Begin to Run Because Plaintiffs' Insureds Did Not Discover and Could Not Discover Their Claims Based on the Defect**

131.   Plaintiffs' insureds had no knowledge of Defendants' misconduct, including the omissions and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein.

132.   Plaintiffs' insureds did not discover, and could not discover through the exercise of reasonable diligence, the fact that Defendants had manufactured and/or sold the Subject Vehicles with the concealed Defect.

133.   The limited, though probative, disclosures and revelations alleged in this Complaint required extensive investigation by counsel who suspected, and then became fully aware of, the Defect.

134.   Ordinary consumers do not have detailed knowledge of vehicle systems and components, although they are justified in expecting their vehicles to be free of substantial defects like the Defect at issue in this action.

135.   Defendants maintain exclusive control over their proprietary design materials and other technical information that would have revealed the existence and nature of the Defect and the ways in which it manifests when operating a Subject Vehicle. Plaintiffs' insureds had no access to those materials or to any substitute that ordinary diligence would have revealed and, as a result, they could not reasonably have been expected to discover the Defect.

1   136.   No information in the public domain at the time of their purchases or
2   leases by Plaintiffs' insureds sufficed to reveal Defendants' misconduct earlier,
3   including their omissions and concealment of the Defect, or the Defect itself.

4   137.   Accordingly, the statute of limitations did not begin to run because
5   Plaintiffs' insureds did not discover and could not discover their claims, or, in the
6   alternative, because fraudulent concealment tolled the statute of limitations.

7   138.   Defendants concealed the Defect for several years and have continued to
8   do so up through the date this action was filed. They did and do so to create the false
9   impression in the minds of Plaintiffs' insureds that the Subject Vehicles were
10   merchantable and that their component parts, including the engine immobilizer, were
11   able to perform their intended function safely and reliably.

12   139.   Plaintiffs' insureds were justified in not bringing the claims earlier based
13   on Defendants' failure to inform Plaintiffs' insureds of the existence, nature, extent,
14   and scope of the Defect or its manifestations in Subject Vehicles.

15   140.   For the foregoing reasons, the claims asserted in this action accrued
16   much later than the time Plaintiffs' insureds purchased and leased their Subject
17   Vehicles, and this action is timely.

18   **B.     Fraudulent Concealment Tolled the Statute of Limitations**

19   141.   In the alternative, and based upon the same facts alleged above,
20   application of the doctrine of fraudulent concealment tolled the statute of limitations
21   on the claims asserted here.

22   142.   Plaintiffs' insureds were unaware of the Defect and Defendants'
23   misconduct when they purchased or leased their Subject Vehicles.

24   143.   Defendants' affirmative acts and omissions alleged herein were
25   wrongfully concealed and carried out in a manner that precluded detection of both the
26   acts and omissions themselves, and the existence, nature, extent, and scope of the
27   Defect and its manifestations in Subject Vehicles.

28

BLOOD HURST & O' REARDON, LLP

144. By its very nature, Defendants' misconduct was inherently self-concealing. Vehicle systems and components are subject to regulations and other laws governing their safety and merchantability.

145. Plaintiffs' insureds reasonably expected the Subject Vehicles, including their systems and components, to meet or exceeded such standards.

146. Accordingly, a reasonable person under the circumstances would have no cause to investigate the legitimacy of Defendants' conduct before or after purchasing or leasing a Subject Vehicle and would have faced extreme difficulty in discerning the Defect that they had no reason to suspect in the first place.

147. Because the misconduct was both self-concealing and affirmatively concealed by Defendants, Plaintiffs' insureds had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed.

148. For these reasons, the statute of limitations did not begin to run and has been tolled with respect to the claims that Plaintiffs allege in this Complaint and any others that might relate to it.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT AND MATERIALLY IDENTICAL STATE STATUTES

149. Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

150. Defendants are each a "person" under Cal. Civ. Code § 1761(c).

151. Plaintiffs' insureds at issue are "consumers" as defined by Cal. Civ. Code § 1761(d) because they purchased or leased one or more Subject Vehicles for personal, family or household purposes.

152. The Subject Vehicles are "goods" as defined by Cal. Civ. Code § 1761(a).

00203355

153.   Defendants' conduct, as described herein, in misrepresenting the safety and security of the Subject Vehicles, and omitting the fact that they designed and manufactured the Subject Vehicles with the Defect making them unsafe and unfit for the ordinary purpose for which they were used, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*. Specifically, Defendants violated the CLRA by misrepresenting and omitting material facts regarding the Defect in the Subject Vehicles, and by engaging in the following practices proscribed by Cal. Civil Code § 1770(a) in transactions that were intended to result in, and did result in, the sale of Subject Vehicles:

a.     representing that Subject Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

b.     representing that Subject Vehicles were of a particular standard, quality, or grade if they are of another;

c.     advertising Subject Vehicles with intent not to sell them as advertised; and

d.     representing that Subject Vehicles have been supplied in accordance with previous representations when they have not.

154.   Defendants violated the CLRA by selling Subject Vehicles that it knew possessed the common Defect that caused the Subject Vehicles to be stolen and damaged, and exposed Plaintiffs' insureds and the public to an unreasonable safety risk. Defendants omitted from Plaintiffs' insureds, to whom it had a duty to disclose, the material fact that Subject Vehicles were sold with the Defect. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

155.   Defendants had a duty to disclose the Defect because:

a.     The safe and reliable operation and functionality of the Subject Vehicles' immobilizer system is central to the secure and reliable function of the Subject Vehicles as a whole, including preventing and deterring thieves;

BLOOD HURST & O' REARDON, LLP

b.      Defendants were in a superior position to know that the Defect existed as the designers, manufacturers, assemblers, distributors, marketers, and warrantors of the Subject Vehicles, and Defendants remain in that position as to the vast majority of unwitting owners and lessees of the Subject Vehicles;

c.      Plaintiffs' insureds were not involved in the design or manufacture of the Subject Vehicles, and as such could not be expected to learn or know about the existence and cause of the Defect;

d.      Defendants knew that Plaintiffs' insureds lacked access to the design and manufacturing materials necessary to understand the existence and cause of the Defect;

e.      Defendants knew that ordinary reasonable consumers would expect the Subject Vehicles to be free of significant defects central to the security and safety of the vehicles such that the Defect would constitute a material fact in any purchasing or leasing decision, i.e., it would have influenced any and every reasonable consumer's purchasing or leasing decision, including whether and how much to pay to purchase or lease a vehicle; and

f.      Defendants' public pronouncements and representations in marketing and labeling the Subject Vehicles were uniformly positive and consistent in terms of theme and content, thus giving rise to a duty to tell the whole truth about the Subject Vehicles.

156.    Ordinary reasonable consumers have no general appreciation of the components and subcomponents of vehicles and vehicle immobilizing systems, but would expect the vehicle to be well-designed and to offer a reasonable level of safety and reliability when used as intended.

157.    Ordinary and objectively reasonable consumer would expect the Subject Vehicles to be free of significant defects central to the security of the vehicles and thus implicitly and necessarily would hold such an expectation as to the engine immobilizing system and its component parts.

BLOOD HURST & O' REARDON, LLP

00203355

158.   The safe, reliable, and proper functioning of the engine immobilizer is a material component of a vehicle transaction because it is required to prevent thieves from easily hot-wiring and stealing the Subject Vehicles. Accordingly, every ordinary and objectively reasonable consumer would have considered the Defect to be an important and material fact that would have substantially influenced their decision of whether to purchase or lease a Subject Vehicle and how much to pay, if anything.

159.   Every ordinary and objectively reasonable consumer acting reasonably under the circumstances would have been deceived by Defendants' misconduct, including their concealment of the Defect.

160.   As a direct, foreseeable, and proximate result of Defendants' deceptive practices, Plaintiffs or their insureds:

a.   Purchased or leased a Subject Vehicle they otherwise would not have purchased or leased or paid more than they otherwise would have;

b.   Purchased or leased a Subject Vehicle that was stolen and damaged; and

c.   Suffered actual damages and other economic harms because of the latent Defect, including the losses described elsewhere in this Complaint.

161.   Pursuant to California Civil Code §1782(d), Plaintiffs seek a Court order enjoining the above-described wrongful acts and practices of Defendants, ordering Defendants to extend repair remedies to all Subject Vehicles, and awarding restitution and disgorgement.

162.   Pursuant to § 1782 of the Act, Plaintiffs notified Defendants in writing of the particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. A copy of the letters are attached hereto as Exhibit A.

163.   If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and or to give notice to all affected consumers within

BLOOD HURST & O' REARDON, LLP

00203355

30 days of the date of written notice pursuant to § 1782 of the CLRA, Plaintiffs will amend this Complaint to add claims for actual, punitive and statutory damages, as appropriate.

164.   Defendants' conduct is fraudulent, wanton, and malicious.

165.   Plaintiffs also seek attorneys' fees and costs as permitted by the CLRA.

166.   Pursuant to § 1782(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper form.

**COUNT II**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
AND MATERIALLY IDENTICAL STATE STATUTES**

167.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

168.   The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*. ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendants committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, and violating California Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (7), (9), and (16), 1790, *et seq.* (the Song-Beverly Consumer Warranty Act), California Business & Professions Code §§ 17500, *et seq.*, the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*), Federal Motor Vehicle Safety Code Standard 114, breach of the implied duty of merchantability, and the common law, including fraudulent omissions and concealment. Plaintiffs reserve the right to allege other violations of the law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

169.   In the course of conducting business, Defendants committed "unfair" business practices by, among other things, making the representations and omissions of material facts concerning the Subject Vehicles' security and safety despite the fact

56

00203355

that they all contained the material Defect. There is no societal benefit from such false and misleading representations and omissions—only harm. While Plaintiffs and their insureds were harmed by this conduct, Defendants were unjustly enriched. Despite acknowledging the significant effectiveness of immobilizers in decreasing auto thefts, considering the relatively minimal cost of installing the component, and knowing that almost all their competitors provide immobilizers as a standard feature, Defendants have deliberately sold millions of Subject Vehicles without this crucial safety component. By prioritizing profits over safety, Defendants have exposed millions of individuals to the potential risks of property loss, injury, and even death. As a result, Defendants' conduct is "unfair," as it has offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

170.   Further, as set forth in this complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of California Business & Professions Code §§ 17200, *et seq*. There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

171.   California Business & Professions Code §§ 17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the security and safety of the Subject Vehicles.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

172.   Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false or misleading and likely to deceive the consuming public within the meaning of California Business & Professions Code §§ 17200, *et seq*.

173.   Plaintiffs and their insureds have in fact been deceived as a result of their reliance on Defendants' material representations and omissions, which are described above.  Plaintiffs have suffered injury in fact and lost money as a result of the property damage to the Subject Vehicles proximately caused by Defendant's misconduct as alleged herein.

174.   Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.  Plaintiffs seek restitution from Defendants of all money obtained from Plaintiffs as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with California Business & Professions Code § 17203.

**COUNT III**

**COMMON LAW FRAUDULENT OMISSION/CONCEALMENT**

175.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

176.   Defendants were aware of the Defect within the Subject Vehicles when the Subject Vehicles were marketed and sold to Plaintiffs' insureds and the other owners and lessees of the Subject Vehicles.

177.   Having been aware of the Defect within the Subject Vehicles, and having known that Plaintiffs and their insureds could not have reasonably been expected to know of the Defect, Defendants had a duty to disclose the Defect to Plaintiffs' insureds in connection with the sale or lease of the Subject Vehicles.

178.   Defendants did not disclose the Defect to Plaintiffs' insureds in connection with the sale or lease of the Subject Vehicles.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

179.   For the reasons set forth above, the Defect within the Subject Vehicles comprises material information with respect to the sale or lease of the Subject Vehicles.

180.   In purchasing or leasing the Subject Vehicles, Plaintiffs' insureds reasonably relied on Defendants to disclose known material defects with respect to the Subject Vehicles.

181.   Had Plaintiffs' insureds known of the Defect within the Subject Vehicles, they would have not purchased or leased the Subject Vehicles or would have paid less for the Subject Vehicles.

182.   Through their omissions regarding the Defect within the Subject Vehicles, Defendants intended to induce, and did induce, Plaintiffs' insureds to either purchase or lease a Subject Vehicle that they otherwise would not have purchased or leased, or pay more for a Subject Vehicle than they otherwise would have paid.

183.   As a direct and proximate result of Defendants' omissions, Plaintiffs and their insureds suffered property damage, including the loss of use of the Subject Vehicles that they would not have suffered had Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT IV**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

184.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

185.   Defendants are and were, at all relevant times, a merchant with respect to Subject Vehicles and manufactured, distributed, warrantied and/or sold Subject Vehicles.

186.   A warranty that Subject Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold was implied by law in the instant transaction.

BLOOD HURST & O' REARDON, LLP

00203355

187.   Plaintiffs' insureds purchased and leased Subject Vehicles that were manufactured and sold by Defendants in consumer transactions.

188.   Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used. Subject Vehicles left Defendants' possession and control with defective safety, security and anti-theft measures that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiffs' insureds used their Subject Vehicles in the normal and ordinary manner for which Subject Vehicles were designed and advertised.

189.   Defendants knew before the time of sale or lease to Plaintiffs' insureds, or earlier, that Subject Vehicles were produced with the Defect, rendering Subject Vehicles unfit for their ordinary purpose.

190.   Despite Plaintiffs' insureds' normal and ordinary use, maintenance, and upkeep, the Subject Vehicles were stolen and damaged as a result of a manufacturing or design defect that existed at the time Defendants transferred Subject Vehicles from their possession or control. The Defect rendered Subject Vehicles unfit for their ordinary use and incapable of performing the tasks they were designed, advertised, and sold to perform.

191.   As a result, the Subject Vehicles and their safety, security and anti-theft measures are not of fair or average quality. Nor would they pass without objection in the automotive industry. The fact that the Defect makes it exceedingly simple for thieves to seal the Subject Vehicles, and hence, a target for thieves to steal, renders the vehicle unsafe to drive and requires repairs of Subject Vehicle's safety and security measures before safe, ordinary use or ownership can resume.

192.   All conditions precedent have occurred or been performed.

193.   Defendants had actual notice of their breach of warranty. Through consumer complaints, news stories, insurance claims, and law enforcement reports, Defendants learned that the Defect, the existence and ubiquity of which it knew much

BLOOD HURST & O' REARDON, LLP

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

earlier, has been the subject of publicized disputes nationwide. Their implementation of the customer service advisory directed to Subject Vehicles shows actual notice.

194.   Defendants' warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendants knew when it first made these warranties and their limitations that the defect existed and that the warranties might expire before a reasonable consumer would notice or observe the defect. Defendants also failed to take necessary actions to adequately disclose or cure the Defect after the existence of the Defect came to the public's attention and sat on their reasonable opportunity to cure or remedy the Defect, their breaches of warranty, and losses to Plaintiffs and their insureds. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendants any more time to cure the Defect, their breaches of warranty, or otherwise attempt to resolve or address Plaintiffs' claims.

195.   As a direct and foreseeable result of the Defect in Subject Vehicles, Plaintiffs and their insureds suffered property damage to the Subject Vehicles, out-of-pocket losses related to repairing or replacing their defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

196.   Plaintiffs and their insureds have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Plaintiffs and their insureds. Notwithstanding this, privity is not required in this case because Plaintiffs and their insureds are intended third-party beneficiaries of contracts between Defendants and their dealers; specifically, they are the intended beneficiaries of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

because the Subject Vehicles are inherently unfit and dangerous due to the aforementioned Defect and nonconformities.

## COUNT V

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT CAL. CIV. CODE §§ 1790,** *et seq***.**

197.   Plaintiffs repeat and reallege all paragraphs as if fully set forth herein.

198.   Plaintiffs' insureds, and thus because they stand in their shoes for these and the other legal claims, Plaintiffs, are each a buyer as Civil Code section 1791, subdivision (b), defines the term "buyer."

199.   The Subject Vehicles are consumer goods, as Civil Code section 1791, subdivision (a), defines the term "consumer good." The Subject Vehicles include new motor vehicles, as Civil Code section 1793.22, subdivision (e)(2), defines the term "new motor vehicle."

200.   Defendants were, at all times relevant hereto, the manufacturers, distributors, warrantors, lessors, and/or sellers of the Subject Vehicles. Defendants knew or had reason to know of the specific use for which the Subject Vehicles were purchased or leased.

201.   Plaintiffs' insureds purchased or leased a Subject Vehicle and Defendants provided Plaintiffs' insureds with a standard express written warranty covering the Subject Vehicles.

202.   Defendants are unable to conform Subject Vehicles to its express warranty as it has no fix for the Defect. Defendants are only prepared to offer a software patch on the Subject Vehicles, which is an inferior safety and anti-theft measure that means Plaintiffs' insureds cannot safely operate the Subject Vehicles, which cannot be made to conform to Defendants' express warranty.

203.   Under the Song-Beverly Consumer Warranty Act, all express warranties are accompanied by the implied warranty of merchantability, which may not be disclaimed by the manufacturer or retail seller.

BLOOD HURST & O' REARDON, LLP

00203355

204.    Defendants provided Plaintiffs and their insureds with an implied warranty that the Subject Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold. However, the Subject Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation with adequate anti-theft protection because, among other things, the Subject Vehicles suffered from the inherent Defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation with adequate anti-theft protection.

205.    Defendants impliedly warranted that the Subject Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (1) a warranty that the Subject Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Subject Vehicles would be fit for their intended use while they were being operated.

206.    Contrary to the applicable implied warranties, the Subject Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs' insureds with safe transportation and adequate anti-theft protection. Instead, the Subject Vehicles are defective.

207.    Defendants' breach of implied warranties was willful and has deprived Plaintiffs and their insureds of the benefit of their bargain.

208.    Defendants had notice of their breach as alleged herein.

209.    As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and their insureds sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and their insureds, who are entitled to recover under section 1794 of the act, including civil penalties, actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other such relief the Court deems appropriate.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

1
2
3

**COUNT VI**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
15 U.S.C. §§ 2301,** *et seq.*

4      210.   Plaintiffs repeat and reallege all paragraphs as if fully set forth herein.

5      211.   Plaintiffs' insureds, and thus because they stand in their shoes for these
6   and the other legal claims, Plaintiffs, are "consumers" within the meaning of the
7   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

8      212.   Defendants are "suppliers" and "warrantors" within the meaning of the
9   Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

10     213.   The Subject Vehicles are "consumer products" within the meaning of the
11   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

12     214.   Defendants provided Plaintiffs and their insureds with an implied
13   warranty that the Subject Vehicles and any parts thereof are merchantable and fit for
14   the ordinary purpose for which they are sold. The Subject Vehicles' implied warranty
15   of merchantability is covered by 15 U.S.C. § 2301(7).

16     215.   With respect to Plaintiffs' insureds' purchases or leases of the Subject
17   Vehicles, the terms of Defendants' implied warranty became part of the basis of the
18   bargain between Defendants and Plaintiffs' insureds.

19     216.   Defendants breached their implied warranties by not providing
20   Plaintiffs' insureds with vehicles that have adequate anti-theft protection. Instead, the
21   Subject Vehicles each have the same manufacturing or design Defect that renders
22   them vulnerable to an abnormally high likelihood of being stolen and consequently
23   increases the likelihood of suffering property damage and loss. This Defect renders
24   the Subject Vehicles unmerchantable.

25     217.   Further, Defendants have refused to provide an adequate and timely
26   warranty repair for the Defect, thus rendering the satisfaction of any notice
27   requirement futile. As stated above, owners and lessees of the Subject Vehicles report

28

Blood Hurst & O' Reardon, LLP

00203355

the Defect to Defendants or their dealer, but Defendants have failed to repair the Defect.

218.   At the time of sale or lease of each Subject Vehicle, Defendants knew, should have known, or were reckless in not knowing of the Subject Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect.

219.   The amount in controversy of Plaintiffs' individual claims exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

220.   Plaintiffs seek all damages permitted by law, including recovery of the losses that proximately resulted from the property damage to the Subject Vehicles as a result of the Defect, in an amount to be proven at trial.

## COUNT VII
## UNJUST ENRICHMENT

221.   Plaintiffs repeat and reallege all paragraphs as if fully set forth herein.

222.   When they purchased and leased the Subject Vehicles, Plaintiffs' insureds conferred tangible and material economic benefits upon Defendants, who readily accepted and retained these benefits.

223.   Had Plaintiffs' insureds known of the Defect within the Subject Vehicles, they would have not purchased or leased the Subject Vehicles or would have paid less for the Subject Vehicles. Therefore, Defendants profited from the sale and lease of the Subject Vehicles to the detriment and expense of Plaintiffs.

224.   Defendants appreciated these economic benefits. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Defect, yet they failed to disclose this knowledge and misled the Subject Vehicles' owners and

BLOOD HURST & O' REARDON, LLP

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

00203355

lessees regarding the nature and quality of the Subject Vehicles while profiting from this deception.

225.   It would be unjust, inequitable, and unconscionable for Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

226.   Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

227.   Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, Plaintiffs will have no adequate legal remedy.

## COUNT VIII
## DECLARATORY RELIEF

228.   Plaintiffs repeat and reallege all paragraphs as if fully set forth herein.

229.   Pursuant to 28 U.S.C. § 2201, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

230.   Defendants marketed, distributed, and sold Subject Vehicles without engine immobilizers and on account of this Defect, Subject Vehicles insured by Plaintiffs were stolen and damaged. Plaintiffs and their insureds suffered property damage and loss.

231.   Accordingly, Plaintiffs seek entry of the following declarations: (1) the Subject Vehicles are defective and that this common Defect presents a serious security and safety issue to owners and lessees of the Subject Vehicles; (2) all persons who purchased the Subject Vehicles are to be provided the best practicable notice of the Defect, which cost shall be borne by Defendants; and (3) Defendants must establish

BLOOD HURST & O' REARDON, LLP

00203355

a repair and replacement program and protocol and notify Plaintiffs' insureds at issue of such program, pursuant to which Defendants, including their authorized representatives, and at no cost to Plaintiffs' insureds, will promptly fix the Subject Vehicles to include engine immobilizers at no cost to Plaintiffs or their insureds.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

a.    finding that Defendants engaged in the unlawful conduct as alleged herein;

b.    awarding Plaintiffs damages;

c.    awarding Plaintiffs restitution and disgorgement of monies Defendants acquired through their violations of the law;

d.    awarding Plaintiffs injunctive and declaratory relief;

e.    requiring Defendants to install engine immobilizers on Subject Vehicles;

f.    awarding Plaintiffs pre-judgment and post-judgment interest on all amounts awarded;

g.    awarding Plaintiffs reasonable attorneys' fees, costs, and expenses; and

h.    granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

Dated: June 14, 2023

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
JAMES M. DAVIS (301636)

By:      *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)

67

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

BLOOD HURST & O' REARDON, LLP

00203355

1
2

tblood@bholaw.com
toreardon@bholaw.com
jdavis@bholaw.com

3
4
5
6
7

MATTHIESEN, WICKERT
    & LEHRER, S.C.
RICHARD A. SCHUSTER
ASHTON T. KIRSCH
1111 E. Sumner Street
Hartford, WI  270670
Tel: 262/673-7850
262/673-3766 (fax)
rschuster@mwl-law.com
akirsch@mwl-law.com

8
9
10
11

POYNTER LAW GROUP
SCOTT POYNTER
407 President Clinton Ave., Ste 201
Little Rock, AR 72201
Tel: 501/812-3943
scott@poynterlawgroup.com

12

*Attorneys for Plaintiffs*

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O' REARDON, LLP

00203355

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION